UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

United States District Court
Southern District of Texas

**ENTERED**

October 27, 2021

Nathan Ochsner, Clerk

| | | |
|---|---|---|
| Clarisse Christine Toledo, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | Civil Action H-19-3683 |
| | § | |
| HCA Healthcare, Inc., et al., | § | |
| | § | |
| Defendants. | § | |

## Opinion on Summary Judgment

1.     *Background.*

HCA Healthcare, Inc., operates medical centers across the country, including Pasadena Bayshore Hospital or the Bayshore Medical Center, an inpatient rehabilitation facility near Houston. Because it operates as an inpatient center, HCA and Bayshore must follow regulations about admission requirements, therapy time thresholds, screening, and discharge.

Clarisse Toledo was an occupational therapist and later a payment coordinator for Bayshore. She was responsible for completing patient assessments and submitting claims to Medicare. Toledo says that she noticed multiple regulatory violations and told supervisors about them.

On July 10, 2017, Bayshore fired Toledo.

On December 10, 2017, Toledo sued HCA and Bayshore for retaliation under the False Claims Act and the 2013 National Defense Authorization Act. Toledo has moved for partial summary judgment on the protected activity element. HCA and Bayshore have moved for summary judgment on all claims. HCA and Bayshore will prevail.

2.    *Retaliation.*

To establish a prima facie retaliation claim under the False Claims Act, Toledo must show that: (a) she engaged in a protected activity under the statute; (b) Bayshore knew she engaged in that activity; and (c) Bayshore acted adversely because she did it.[1] Once this is done, the burden shifts to Bayshore to give a legitimate, non-retaliatory reason for firing Toledo – which she may rebut by showing it was pre-textual.[2] To be a protected activity, Toledo must have complained about possible fraud to Bayshore.[3]

To succeed on a retaliation claim under the National Defense Authorization Act, Toledo must show that: (a) she engaged in a protected activity while working for a federal contractor; (b) the activity was reasonably related to Bayshore's mismanaging federal funds; and (c) the activity was a contributing factor to the adverse action.[4] A protected activity is disclosing information that is reasonably believed to be evidence of a "gross mismanagement of a Federal contract ... , a gross waste of Federal funds ... , or a violation of law, rule, or regulation related to a Federal contract."[5] The disclosure must be to a covered person, like a managing official, who is responsible to investigate, discover, or address misconduct.[6]

Toledo says that she "repeatedly engaged in protected activity ... by making internal complaints to various supervisors, other superiors, and a compliance officer" related to: (a) Bayshore's therapists not giving patients the

---

[1] *United States ex rel. Johnson v. Kaner Med. Grp., P.A.*, 641 F. App'x 391, 395 (5th Cir. 2016).

[2] *Diaz v. Kaplan Higher Educ., L.L.C.*, 820 F.3d 172, 176 (5th Cir. 2016).

[3] *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994).

[4] 41 U.S.C. § 4712.

[5] *Id.*

[6] *Id.*

necessary amount of weekly therapy, (b) nurses not documenting patient scores or discharge assessments, and (c) her supervisor, Simmons, asked her to "back-date" missing admissions orders. She argues that her complaints concerned violating the contractual requirements to get Medicare reimbursements.

She insists that the decision makers who fired her knew about her complaints because they "relied on Simmons' account of the reasons to fire" her. She claims that the temporal proximity between her complaints and being fired shows that they caused her to be fired.

For retaliation claims, all complaints that Toledo made after she was fired – including the one to the ethics hotline – are not considered.[7] Because Toledo's regular job duties involved reporting compliance issues, she must show that she complained about matters beyond her job responsibilities.[8] The payment coordinator is responsible for collecting and properly reporting specific patient information so that Medicare can reimburse, which intrinsically means she should report compliance issues related to that information.

Toledo admits that she did not tell her supervisors that she believed the "back-dating" request was illegal, and those complaints were largely unshared vents. She continually has issue with the use of late scores, but never refers to a single rule or regulation that it violates. Any issue related to missing documentation is a part of her job and should be reported by her. Toledo counters by saying that her reporting was beyond the scope of her job because she went outside her chain of command and escalated her concerns after she felt that they were not fully resolved, but her possible confusion with the corporate structure of Baytown is not a genuine dispute.

She characterized the therapy time problems as a mistake and cannot show that she expressed that it was anything more serious. Toledo admitted in her deposition that she was not aware of a single fraudulent claim being made by

---

[7] *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262 (5th Cir. 2013).

[8] *Robertson*, 32 F.3d at 952.

Bayshore to Medicare. The extensive record shows that Toledo complained about mistakes, glitches, poor work, and her frustrations – but not fraud or illegal activity. Other employees raising the possibility of fraud is not *her* protected activity.

As the one who brought the case, it is Toledo's burden to show that she engaged in a protected activity. Her self-serving characterizations of the facts do not create a genuine dispute of those facts. Objectively viewing the facts reveals that Bayshore was aware of problems that it was having and attempted to create corrective plans – not intentional defrauding of the government. Certain orders may have been expressed in confusing ways, and overall objectives not made abundantly clear. Toledo has no evidence that this is retaliatory to anyone. Many at Bayshore listened to her concerns, agreed with the need to correct, and implemented strategies to combat them.

Carrie Capps and Mark Rozell made the decision to fire Toledo. She admits to having never reported concerns of illegal or fraudulent activity to either of them. Complaints to others are irrelevant unless they were forwarded to Capps and Rozell. Both testified to having no knowledge of Toledo complaining of fraud.

Toledo argues that Capps and Rozell knew about her complaints because Simmons initiated the decision to fire her. She says that this along with it being less than a week between her complaining about the "back-dating" and her firing are enough to create a genuine dispute over Bayshore's knowledge and causation.

Simmons was not consulted nor participated in the meeting to decide whether to fire Toledo. She cannot supply evidence to show that Simmons raised concerns about Toledo's complaints with the decision-makers. It is irrelevant if Simmons knew of her complaints if she did not pass those along to Capps and Rozell. The record is clear that Toledo's firing was already in the works when the "back-dating" issue arose, so her temporal argument is insufficient.

Even if Toledo was able to show a prima facia retaliation claim, Bayshore has given a legitimate, non-retaliatory reason to fire her. Toledo had been trained extensively in her job as payment coordinator – more than any other coordinator in the division. Even with this training, Toledo continued to make mistakes in the same areas that she had received targeted, one-on-one training. These mistakes had the potential to lead to lost revenues for Baytown and leave patients without necessary care. As an at-will employee, it is unquestioned that poor performance is a legitimate reason to be fired.[9]

Toledo argues that this was pretext because: (a) the number of errors was lower than what she was told; (b) the timing of when some of the errors were caught; (c) Baytown inadequately investigated her retaliation; and (d) Baytown's normal practice is having two counseling sessions and a performance improvement plan – which she claims was not done.

The record reflects several documented mistakes by Toledo. Bayshore does not need to wait for a specific number of mistakes to occur before firing her. Any potential investigation related to a complaint made after she was fired is outside of the pretext analysis. Toledo acknowledged that she had two verbal counseling sessions. Her opinion that they were not "constructive" and a coaching was irrelevant. Her subjective interpretation of the counseling does not mean it was not one. Because Toledo was continuing to make mistakes after getting targeted training, Rozell's and Capps's belief that a performance plan would have been ineffectual is reasonable.

Toledo's retaliation claims fail.

---

[9] See Strong v. Univ. Healthcare Sys., LLC, 482 F.3d 802, 808 (5th Cir. 2007).

3.      *Conclusion.*

Clarisse Christine Toledo will take nothing from HCA Healthcare, Inc., Pasadena Bayshore Hospital, Inc., and Bayshore Medical Center, Inc.


Signed on October **26**, 2021, at Houston, Texas.


Lynn N. Hughes
United States District Judge